Linn C. BAKER, Treasurer of the State of Utah, Plaintiff and Respondent,

v.

Scott M. MATHESON, Governor of the State of Utah; Dale D. Williams, Director of the Department of Finance of the State of Utah; Richard G. Jensen, Auditor of the State of Utah; Robert B. Hansen, Attorney General of the State of Utah; State Tax Commission of the State of Utah, Defendants and Appellants,

and

Miles "Cap" Ferry, President of the Utah State Senate and Chairman of the Legislative Management Committee, and James V. Hansen, Speaker of the House of Representatives and Vice Chairman of the Legislative Management Committee, Defendants in Intervention.

No. 16703.

Supreme Court of Utah.

Dec. 28, 1979.

234

Michael L. Deamer, Deputy Atty. Gen., H. Wright Volker, Asst. Atty. Gen., for defendants and appellants.

George M. Mecham, Salt Lake City, Asst. Legislative Counsel, for defendants in intervention.

James L. Barker, Jr., Craig L. Barlow, Asst. Attys. Gen., Salt Lake City, for plaintiff and respondent.

STEWART, Justice:

The issue raised on this appeal is the constitutionality of § 59–26–1 (the "Act")[1] which provides for a refund to certain renters and homeowners residing in the State of Utah of funds from the State's general fund. The State Treasurer, Linn C. Baker ("plaintiff"), brought the action to test the constitutionality of the Act. The named defendants are the Governor of the State of Utah, Scott M. Matheson, and the Commissioners of the State Tax Commission ("defendants"). Miles "Cap" Ferry, President of the Utah State Senate, and James V. Hansen, Speaker of the Utah State House of Representatives, intervened on the side of the defendants.

Plaintiff filed a petition for declaratory and injunctive relief in the district court alleging sixteen constitutional infirmities in the Act. The parties stipulated that there were sufficient funds in the State's general fund from which the necessary payments could be made. Cross-motions for summary judgment were filed on the ground that the constitutionality of the Act could be decided solely as a matter of law. The district court, without an opinion or other explanation, granted plaintiff's motion and permanently enjoined the State, through its appropriate officials, from dispensing any monies pursuant to the Act. Since the plaintiff offered no evidence by affidavit or otherwise of its claims of unconstitutionality, the trial court ruled that the statute is unconstitutional on its face.

Plaintiff's numerous contentions rest on various state and federal constitutional provisions. Specifically, it is contended that the Act violates: (1) Article XIII, §§ 2 and 3 of the Utah Constitution which require uniform assessment and taxation by the State of all tangible property in the State; (2) Article III, Second, of the Utah Constitution which prohibits the State from taxing lands belonging to citizens of the United States residing outside the State at a higher rate than lands belonging to residents of the State; (3) Article XIII, § 5 which prohibits the Legislature from imposing taxes "for the purpose of any county, city, town or other municipal corporation"; (4) the due process clauses of Article I, § 7 of the Utah Constitution and the Fourteenth Amendment of the United States Constitution because a state may not, under those provisions, appropriate funds for private purposes; (5) the privileges and immunities clause of Article IV, § 2 of the United States Constitution because it discriminates against nonresidents of the State; (6) Article XIII, § 9 and Article XIV, §§ 1 and 3 of the Utah Constitution which prohibit the creation of certain State indebtedness and one legislature from binding future legislatures; and (7) the equal protection provisions of Article I, § 24 of the Utah Constitution and the Fourteenth Amendment of the United States Constitution because the statute lacks a legitimate governmental interest, is not rationally related to its objective, and rests upon capricious classifications. For the reasons stated below, we hold that plaintiff's contentions cannot be sustained.

Subsection 3, Paragraphs (a) and (b) of the Act in question are the operative provisions of the Act. They permit the "owner of a dwelling" and the "renter of a dwelling comprising a household" to file claims for refunds "of state general fund free revenue." The owner of a dwelling is entitled to a payment "equal to 27% of the property taxes levied on the dwelling commencing with the calendar year 1979 and each calendar year thereafter." The payments are subject to a $400 maximum and a $100 minimum. The renter of a dwelling is entitled to a refund of general fund revenue "equal to 2.7% of the rent paid on the household during the one year period prior to the month in which the renter files a

---

1. The 1979 Session of the Utah State Legislature enacted Senate Bill 320 as § 1 of Chapter 215, Laws of Utah, 1979. It has since been codified as § 59–26–1 of the Utah Code Annotated (1953), as amended.

claim . . . and each one year period thereafter, or $100, whichever is greater." No maximum is specified. However, no refund may be granted "in respect to households residing for more than three months of the calendar year in tax-exempt housing."

Subsection 5 of the Act provides that no renter or homeowner who is claimed "as a personal exemption on another individual's income tax return" or has received more than 50% of his support from a household claiming a refund is entitled to a benefit under the Act. Subsection 6 prohibits a refund to any person who receives public funds in the form of a rent subsidy or a specific allocation of public funds for the payment of taxes or rents for the one-year period for which the refund is made. Subsection 7 provides that the payments contemplated shall be calculated "after allowing for the amount of any relief to which [a] claimant is entitled under chapter 25 of title 59" (the so-called "circuit breaker" provision).

The 1979 Legislature contemplated a surplus in the State's general fund which it determined could be used to offset the pervasive effects of inflation and the increased cost of living, and in particular the costs of housing which have resulted in economic hardship to many households. We judicially notice the fact that housing costs have also been magnified by the recent State program of reevaluating real property in various counties. Because of general inflation, the high rate of population growth, and the reevaluation program, the rise in property taxes has been especially rapid.

Section 59–26–1(1)(a) of the Act states:

. . . the financial condition with respect to the Utah state government is such that the revenues being received by it into the general fund are greater than the expenditures contemplated being made from the general fund, the result being that there is an excess of free funds within the general fund.

The Legislature further found that "recent increases in the cost of living in the state has [sic] had its [sic] primary impact upon the individual households, subjecting many of them to extreme economic hardship," § 59–26–1. Based on these findings, the Legislature stated its purpose in enacting § 59–26–1:

(1)(b) The purpose of this act is to provide *for a refund of the excess of the free revenues in the state general fund* on an equitable basis to those described in subsection (1)(a) who have experienced the primary impact of the increases in the property taxes, and increased living costs, *this refund to be effectuated through payments from these free revenues and computed on the basis provided for in this section.* [Emphasis added.]

It is conceded by all parties that the funds in the State's general fund which are to be refunded are not derived from property taxes. These monies are derived from inheritance taxes, license taxes, occupation taxes, various classes of sales taxes, use taxes, various fees, and interest on the investment of these funds, but they are not derived in any respect from property taxes. The amount of money to be disbursed is approximately $56 million.

## I.

■ In determining whether § 59–26–1 transgresses constitutional limitations, our scope of review is narrow. The wisdom of the legislative enactment is not a legitimate concern of this Court; our only concern is whether any applicable constitutional provision has been infringed. In determining the constitutionality of an enactment that is primarily economic in nature, a presumption of constitutionality is extended to that enactment; and we will not strike it down unless the party attacking it clearly establishes that a constitutional provision has been violated. See, generally, *Stone v. Department of Registration*, Utah, 567 P.2d 1115 (1977); *Thomas v. Daughters of Utah Pioneers*, 114 Utah 108, 197 P.2d 477 (1948), appeal dismissed, 336 U.S. 930, 69 S.Ct. 739, 93 L.Ed. 1090; *State v. Packer Corporation*,

77 Utah 500, 297 P. 1013 (1931), affirmed, 285 U.S. 105, 52 S.Ct. 273, 76 L.Ed. 643.[2]

These general principles, although applied with varying degrees of stringency depending upon the nature of the statutory provision to be construed, establish general guidelines for the functioning of a system of government based upon a separation of powers in which the popular will is effectuated by the legislative branch and the power of constitutional review of legislative enactments is vested in the judiciary. Due respect for the legislative prerogative in lawmaking requires that the judiciary not interfere with enactments of the Legislature where disagreement is founded only on policy considerations and the legislative scheme employs reasonable means to effectuate a legitimate objective. In matters not affecting fundamental rights, the prerogative of the legislative branch is broad and must by necessity be so if government is to be by the people through their elected representatives and not by judges.

## II.

▉ Plaintiff contends that § 59–26–1 is unconstitutional because the payments authorized amount to a refund or rebate of property taxes and violate the uniformity requirements of Article XIII of the Utah Constitution. That Article requires uniformity of property tax assessments and uniform rates of taxation imposed by the State. It also specifies limited categories of persons and property which may be wholly or partially exempt from property taxes. Section 2 of Article XIII provides:

**2.** In *State v. Packer Corporation*, 77 Utah at 508–09, 297 P. at 1016, the Court stated:

> It is well settled in this state, as elsewhere, that the courts will not declare a statute unconstitutional unless it clearly and manifestly violates some provision of the Constitution of the state or of the United States. Every presumption must be indulged in favor of the constitutionality of an act, and every reasonable doubt resolved in favor of its validity. *Utah State Fair Ass'n v. Green*, 68 Utah 251, 249 P. 1016. The whole burden lies on him who denies the constitutionality of a legislative enactment. *Brown v. Maryland*, 12 Wheat. 419, 436, 6 L.Ed. 678. If by

All tangible property in the state, not exempt under the laws of the United States, or under this Constitution, shall be taxed in proportion to its value, to be ascertained as provided by law. . . . The taxes of the indigent poor may be remitted or abated at such times and in such manner as may be provided by law. The Legislature may provide for the exemption from taxation of homes, homesteads, and personal property, not to exceed $2,000 in value for homes, homesteads, and all household furnishings, furniture, and equipment used exclusively by the owner thereof at his place of abode in maintaining a home for himself and family. Property not to exceed $3,000 in value, owned by disabled persons who served in any war in the military service of the United States or of the state of Utah and by the unmarried widows and minor orphans of such disabled persons or of persons who while serving in the military service of the United States or the state of Utah were killed in action or died as a result of such service may be exempted as the Legislature may provide.

Section 3 of that Article provides:

> The *Legislature shall provide by law a uniform and equal rate of assessment and taxation* on all tangible property in the state[,] according to its value in money, and shall prescribe by law such regulations as shall secure a just valuation for taxation of such property, so that every person and corporation shall pay a tax in proportion to the value of his, her, or its tangible property . . . . [Emphasis added.]

> any fair interpretation of the statute the legislation can be upheld, it is the duty of this court to sustain it, even though judges may view the act as inopportune or unwise; and it is not within the province of the judiciary to question the wisdom or the motives of the Legislature in the enactment of a statute. *Utah State Fair Ass'n v. Green*, supra.
>
> This is not, however, the standard of review to be applied when legislative enactments trench on constitutionally guaranteed individual liberties, or when the statutory classifications rest on suspect principles for discriminating against various groups or involve suspect classifications.

Those two provisions require uniformity in two basic aspects of property taxation: uniformity in the assessment of the value of the property, and uniformity in the rate of taxation. The uniform assessment of property throughout the State provides the basis for the various levies that may be imposed by various governmental entities. A particular parcel of property is subject to taxation by state and local governmental entities, each of which may levy a different rate of taxation pursuant to Article XIII, § 10 of the Constitution. There is therefore no general requirement that all property taxes levied on property throughout the State be the same. Section 3 of the Article requires uniformity only as to the rate of property taxation imposed by the State Legislature. Obviously, therefore, the total burden of taxation imposed on property will vary from jurisdiction to jurisdiction. No claim is made in this case that the Act is illegal because of a conflict with the assessment provisions. Moreover, no claim is asserted that the actual rate of taxation imposed by the State is discriminatory; no such claim would be justified because the State presently levies no property tax.

The challenged statute, therefore, in no way directly violates principles of uniformity in property taxation. Indeed, the statute clearly rests on the power of the Legislature to spend in the interest of the public health, safety, morals and welfare and is not a taxation measure at all. As to those two great fundamental powers of government—the power to tax and the power to spend—different constitutional principles are applicable. Plaintiff would, in effect, have this Court convert these constitutional provisions governing taxation into a limitation on the Legislature's spending power. That the Legislature has no power to grant exemptions from property taxes other than those specifically stated in Article XIII, § 2 is conceded, but the payments authorized by the Act do not constitute an exemption from, or a remission of, property taxes. Section 59–26–1 does not constitute a reduction of any kind in property taxes because the State does not levy a property tax. The State cannot pay out, rebate, or remit mo-nies, or grant an exemption as to a tax it does not collect.

The Act does not reduce the amount of property taxes paid to local governmental units, nor are the property tax revenues of any governmental unit in the State of Utah imposing a property tax reduced by even a penny. Every person subject to a local property tax pays exactly the same amount of tax as if § 59–26–1 had never been enacted. Although persons residing in different governmental jurisdictions may pay different property taxes, the Constitution only requires uniformity of ad valorem property taxes by the governmental entities imposing the taxes. *Continental Nat. Bank of Salt Lake City v. Naylor*, 54 Utah 49, 179 P. 67 (1919).

Plaintiff relies heavily on *State v. Armstrong*, 17 Utah 166, 53 P. 981 (1898), for the concededly correct, but inapplicable, proposition that the State may not circumvent the uniformity requirements of Article XIII by accomplishing indirectly what the Constitution directly forbids. In *Armstrong* this Court held that a rebate of property taxes was unconstitutional because it was tantamount to granting a prohibited exemption from property taxes. That holding is unexceptionable. In *Armstrong* the Court stated:

The difference in the sense of these terms [i. e., exemption and rebate] therefore relates to the method, rather than the effect; for *the ultimate result, whether by exemption or abatement, is precisely the same. In either case the property is relieved from the burden of taxation.* Now it is apprehended that the intention of the framers of the constitution, by exempting certain property, was not so much to prevent an assessment and levy of tax thereon as to free it from the burden of maintaining government.

When the tax is abated or remitted after it has been levied, the same object is accomplished; and therefore the mandates of the constitution, that such burdens "shall be equal and uniform" on all property within the state, except such as is exempt by the fundamental law, and

that "every person and corporation shall pay a tax in proportion to the value of his, her, or its property," may be violated by either method. (17 Utah at 172, 53 P. at 982.) [Emphasis added.]

Obviously, as stated in *Armstrong* a rebate of property taxes has an effect similar to an exemption from property taxes. The difference is essentially one of form, not substance. A person granted a rebate of property taxes pays to the taxing authority, a net property tax that is lower than it would otherwise be, and the taxing authority is deprived of revenues that must be made up from other property taxpayers because of the return of a portion of the property taxes to some taxpayers. *Armstrong*, however, does not control the facts of this case.

Although an exemption or a rebate directly reduces the amount of property taxes collected by the taxing entity and the amount of such taxes paid by the taxpayer, no such consequences exist in this case. Section 59–26–1 does not grant an exemption or an abatement, or any other form of property tax reduction, whether the property is owned by a resident or nonresident. All property is taxed the full amount required by law; all the property taxes assessed are paid by the taxpayers directly to the governmental unit imposing such taxes without any reduction, and each and every taxpayer in the State, whether on welfare, a widow, or a millionaire, pays his proportionate share of the taxes. All owners of property within the jurisdiction stand on an exactly equal footing. Every penny of property tax legitimately assessed and levied in the State of Utah is paid or owed, totally unaffected by § 59–26–1.

The payments made are a distribution of general fund taxes. *The taxes distributed (e. g., occupation taxes, license taxes, inheritance taxes) are not ad valorem property taxes, and the uniformity provisions of Article XIII do not apply to the taxes appropriated.* *Davis v. Ogden City*, 117 Utah 315, 215 P.2d 616 (1950); *Salt Lake City v. Christensen Co.*, 34 Utah 38, 95 P. 523 (1908); and *Dixon v. Ricketts*, 26 Utah 215, 72 P. 947 (1903). The implication in Justice Wilkins' dissenting opinion that equality in all taxation is constitutionally required is simply and flatly in error, and the dissenting comment of Justice Maughan that only the majority of the Court does not know that the measure "is a tax relief measure" is, at best, a country mile off the mark. Of course it is. The essential and irrefutable fact is that it is not, and physically cannot possibly be, a rebate, refund, or payment of property taxes, or any taxes which are subject to Article XIII of the Constitution.

Plaintiff's contention that the owners of the other classes of tangible property are compelled to bear a disproportionate share of the tax burden is unarguably inaccurate. So is the argument that the effect of the statute is to create two classes of property taxpayers and to relieve one class of its ratable share of the tax burden. These contentions rest on the error of failing to differentiate between the power to spend *non* property tax revenues on the one hand and the rebating of property taxes so as to reduce the effective amount of property tax paid on the other.

The only colorable claim that § 59–26–1, in its actual operation, constitutes an indirect abatement or remission of property taxes rests upon the statutory formula that the amount of (nonproperty tax) money which may be paid to claimants under the statute, is based in part upon a formula tied to the amount of property taxes paid by some claimants. That fact, however, does not demonstrate that the payments made under the statute are a rebate of property taxes. The reference to the amount of property taxes paid is simply a convenient formula used as a partial measure for determining the amount of payment to be made. The statute also authorizes payments to be made on an entirely different basis, i. e., to renters based on the amount of rent paid. The difference in the formulae employed for disbursing excess funds substantiates the Legislature's declared purpose of alleviating the inimical effects that increases in housing costs have had on the cost of living. The common, underly-

ing, and unifying principle of these two refund formulae is found in the legislative purpose to alleviate the heavy burden of exorbitantly increased housing costs and costs of living, including increased taxes, on the standards of living of those who are recipients.

In sum, Article XIII does not prohibit the Legislature from attempting to alleviate the improverishing and demoralizing effects of inflation which have been in the costs of housing—a basic human need. Whether the recipients be in a poverty, lower income, or so-called middle economic status is irrelevant to the legality of the exercise of legislative power. The impoverishing effects of inflation are magnified by the facts that property values and property taxes have risen faster than wages in many segments of the economy, thereby raising the possibility that some people, especially those on pensions, fixed incomes, social security, and those who are disabled, may not be able to maintain their present habitations; and that as to all, the effect on the standard of living has been substantial.

It may be observed that if plaintiff's position were to prevail under Article XIII, it would likely be destructive of other legislative programs designed to promote adequate housing for all. The instant statute is, as far as Article XIII is concerned, no different in principle than the payment of benefits to persons on welfare. Welfare recipients, as well as the recipients under § 59–26–1, may use the governmentally-supplied funds to pay property taxes. Furthermore, plaintiff's view , if accepted, could raise an issue as to the legality of a long-accepted provision in the income tax laws which permits the amount of income tax paid the State to be reduced in part by the amount of property taxes paid. That monetary benefit, although more indirect, is in some ways similar to the benefits received by the householders under § 59–26–1. Plaintiff's reasoning might well require the conclusion that the monetary value of that deduction amounts to an illegal rebate of property taxes.

Although we do not intimate a question as to the constitutionality of the so-called "circuit breaker" provision, § 59–25–1 et seq., which is designed to provide low-income people property tax relief from State funds, we cannot help but note that if plaintiff's position with respect to Article XIII were sustained, a serious question would arise as to the constitutionality of that provision under Article XIII. The "circuit breaker" provision is entitled "property tax relief." The purpose of that Act is stated in § 59–25–1:

> The purpose of this act is to provide general property tax relief for certain persons who own or rent their places of residence through a system of tax credits and refunds and appropriations from the general fund. The relief so provided is to offset in part the general tax burden, a significant portion of which, directly or indirectly, is represented by property tax. Accordingly, the tax relief provided by this chapter is determined in part by reference to the property tax assessment and collection mechanisms, but, however, is not limited to property tax relief nor is it formulated upon the legislature's power to relieve such taxes. It is for the general relief of taxes and is grounded upon the general legislative power.

The operative provisions of that Act are §§ 59–25–7 and 59–25–7.5. Section 59–25–7 provides for a payment or credit from between $100 and $300 to homeowners earning less than $6,999. Section 59–25–7.5 provides for a payment from between 20% to 95% of the rent paid to renters who earn less than $6,999. The funds to finance these credits are "derived from the general fund and therefore do not include property taxes." See §§ 59–25–7(3) and 59–25–7.5(3). The term "home owners credit" is defined by § 59–25–2(8) to mean "a credit against a claimant's property tax liability measured by reference to, but in no instance to exceed, property taxes accrued."

In sum, we hold that the Act in issue does not violate the uniformity provisions of Article XIII of the Utah Constitution and is not in any respect a rebate, refund or other kind of payment of property taxes to the recipients.

We also hold that since the Act is not a taxing measure, it is not in violation of Article III, Second, which prohibits the lands of nonresidents from being taxed at higher rates than the lands of residents.

█ We further hold that the Act does not violate Article XIII, § 5 of the Utah Constitution which provides:

The Legislature shall not impose taxes for the purpose of any county, city, town or other municipal corporation, but may, by law, vest in the corporate authorities thereof, respectively, the power to assess and collect taxes for all purposes of such corporation.

Plaintiff's contention that this provision is violated by the Act is patently without merit. As has been demonstrated above, the Act is not a taxing measure, and there simply is no substance to the proposition that the Act "impose[s] taxes for the purpose of any county, city, town or other municipal corporation . . . ." The Act makes no provisions whatsoever for any payments to or for any county, city, town or municipal corporation. Plaintiff's contention that "if county property or ad valorem taxes are excessive, they should be reduced by the county commissioners, or the legislature should further limit the authority of counties to impose such taxes," is entirely irrelevant. The Legislature has not made any determination that county property, or ad valorem, taxes are excessive. Indeed, that is an issue of concern primarily for local taxpayers and voters of the State's political subdivisions. However, it is within the power of the Legislature to take note of the effect of local property taxes on the cost of living and to take appropriate measures to mitigate the effect of such taxes by the appropriation of funds to individuals when a public purpose is served thereby, see *infra*.

### III.

Plaintiff further contends that the Act is in violation of the due process clause of Article I, § 7 of the Utah Constitution and the due process clause of the Fourteenth Amendment of the United States Constitution because the appropriations, according to Plaintiff, are for private, not public, purposes.

█ The standard for determining what constitutes a public purpose is not precise and must take its meaning from various circumstances. What constitutes a public purpose at one period of time and under one set of circumstances may not constitute a public purpose at a different time and under different circumstances. "The wants and necessities of the people change. The opportunity to satisfy those wants and necessities by individual effort may vary." *Laughlin v. City of Portland*, 111 Me. 486, 491, 90 A. 318, 320 (1914). The essential determinant is whether the appropriation is for the benefit of the public welfare, as opposed to purely private interests. See *Wood v. Budge*, 13 Utah 2d 359, 374 P.2d 516 (1962).

*Martin v. North Carolina Housing Corporation*, 277 N.C. 29, 175 S.E.2d 665 (1970), discussed the factors to be considered in defining the term "public purpose." Quoting from *Mitchell v. North Carolina Industrial Development Financing Authority*, 273 N.C. 137, 159 S.E.2d 745 (1968), the court in *Martin* stated:

"A slide-rule definition to determine public purpose for all time cannot be formulated; the concept expands with the population, economy, scientific knowledge, and changing conditions. As people are brought closer together in congested areas, the public welfare requires governmental operation of facilities which were once considered exclusively private enterprises, [citation omitted] and necessitates the expenditure of tax funds for purposes which, in an earlier day, were not classified as public. [Citation omitted.] Often public and private interests are so co-mingled that it is difficult to determine which predominates. It is clear, however, that for a use to be public its benefits must be in common and not for particular persons, interests, or estates; the ultimate net gain or advantage must be the public's as contradistinguished from that

of an individual or private entity." [Citation omitted.] (277 N.C. at 43, 175 S.E.2d at 672–73.)

See also *State v. Smith*, 348 Mo. 554, 154 S.W.2d 101 (1941), and *Kinney v. City of Astoria*, 108 Or. 514, 217 P. 840 (1923).

It may be taken as a general proposition which follows from a form of government in which the legislative branch has the constitutional responsibility for providing for the ever-changing needs of the people that, except in egregious cases, it is for the legislature, and not the judiciary, to determine what serves a public purpose. See *State v. Clausen*, 110 Wash. 525, 188 P. 538 (1920). The necessity for providing wide legislative discretion is also supported by the constitutional provision which specifically prohibits numerous private enactments. See Article VI, § 26. By excluding clear cases of private enactments, the Constitution recognizes that, as to nonenumerated private acts, there must be flexibility in drawing the line between public and private acts, and that the determination must necessarily be left primarily to the political process as it may be worked out by the legislative branch.

Given the wide range of social and economic problems with which government must deal, it is impossible, in a society that is highly urbanized, with its members largely dependent on others for their economic well-being, to preclude government from acting in a fashion which benefits individuals directly in the interest of solving large public problems. Such a preclusion would render government impotent to solve some of the most troublesome, pressing problems of society which can best, and sometimes only, be solved by direct assistance to individuals. This Court, accordingly, has sustained the validity of tax-supported, low-income housing, *Utah Housing Finance Agency v. Smart*, Utah, 561 P.2d 1052 (1977). In *Smart* the Court stated:

These benefits, however, are merely incidental to the dominant purpose of the Act to alleviate a serious statewide shortage of decent low and moderate income housing, with its consequent ill effects. While it is improper to spend public funds for private purposes, such private benefits incidental to a dominant public purpose do not detract from the constitutionality of the legislation.

\* \* \* \* \* \* \*

It is immaterial, of course, whether the incidental private benefits conferred by the legislation are viewed as particularly "personal". (561 P.2d at 1055.)

In *Tribe v. Salt Lake City Corporation*, Utah, 540 P.2d 499 (1975), this Court approved a plan of the Redevelopment Agency of Salt Lake City to construct a parking facility pursuant to authority of the Neighborhood Redevelopment Act. The contention was made that the parking facility violated the due process clause because it conferred benefits on private individuals. The Court recognized that a benefit would in fact be conferred on private individuals but that the Act was constitutional because it served the accepted public purpose of seeking to terminate urban blight.

■ Obviously, it is impossible to make a straightline distinction between the legislative conferring of a private benefit and the legislative conferring of a public benefit. Increasingly it is recognized that the health of the whole of society is dependent upon the well-being of various segments of society. It is for this reason that legislatures have enacted myriad welfare programs, disaster relief programs, unemployment compensation legislation, and other such programs which directly benefit individuals. See, e. g., *Unemployment Compensation Commission v. Renner*, 59 Wyo. 437, 143 P.2d 181 (1943).[3]

---

**3.** As far as federal due process is concerned, it is clear that states are accorded great latitude in determining what serves a "public purpose" within their respective jurisdictions. In *Jones v. City of Portland*, 245 U.S. 217, 38 S.Ct. 112, 62 L.Ed. 252 (1917), the Court held that the question of what was a public use was a question for local authorities, legislative and judicial, to decide because of their special means of securing information to enable them to form a judgment. See also *Green v. Frazier*, 253 U.S. 233, 40 S.Ct. 499, 64 L.Ed. 878 (1920).

In the instant case it is apparent from the findings of the Legislature, see § 59–26–1(1)(a) and (b), that the Legislature was attempting to palliate the effects of inflation, in part occasioned by increased property taxes on individual households. The effect of the expenditures authorized transcend personal, private benefits and serve a public purpose. Clearly the Act serves to ameliorate the inequitable nature of property taxes compared with other kinds of taxes. Property taxes are based on the market value of the property, but, unlike most other taxes, bear no necessary or inherent relationship to the income of the taxpayer and therefore to the ability of the taxpayer to pay the tax. The Legislature could well have concluded that ballooning property values, resulting both from inflation and the influx of population, and the resultant escalation of property taxes, have outstripped the increases in wages of those who work and the pensions and retirement benefits of the nonworking portion of the population, thereby posing a hardship in many cases and a threat to adequate housing in some cases. And, since property taxes are generally passed on by landlords to their renters in the form of increased rents, the Legislature was also justified in concluding that the effect of current economic conditions was essentially the same for both homeowners and renters. In addition, another contemplated effect may well have been to increase the disposable income available for purchasing goods and services which would generate greater public revenue through increased spending and in turn serve to reduce unemployment.

■ In general the objective of the Act is to improve the economic welfare and well-being of the State as a whole. The Act serves private interests in a manner that is incidental to the promotion of the general welfare. We conclude that the Act is not a violation of due process of law.

**IV.**

Plaintiff further contends that the Act violates the equal protection clause of the Fourteenth Amendment of the United States Constitution and its essential counterpart under the Utah Constitution, Article I, § 24.[4] In essence these provisions provide that similarly situated people will be dealt with in a similar manner and that people of different circumstances will not be treated as if their circumstances were the same.

Legislative enactments that are basically economic in nature rarely affect all persons equally. Such enactments require classifications which necessarily reflect legislative judgments which accord various weights to various shadings of differences in human affairs. Razor-thin distinctions which are entirely devoid of some arbitrariness are rarely, if ever, possible. The rationality of the classifications is a matter of degree. If courts were to insist upon logical precision in creating classifications not consistent with the nature of the problem to be addressed, legislative power would be seriously crippled. As Justice Holmes observed, "We must remember that the machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. v. Pinson*, 282 U.S. 499, 501, 51 S.Ct. 228, 229, 75 L.Ed. 482 (1931). The Supreme Court of the United States outlined the nature of the issue in *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955):

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. [Citation omitted.] Or the reform may taken one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. [Citation omitted.] The legislature may select one phase of one field and apply a reme-

---

**4.** For the purposes of this opinion we deal with these two provisions as if they imposed the exact same requirements. Article I, § 24 pro- vides: "All laws of a general nature shall have uniform operation."

dy there, neglecting the others. [Citation omitted.] The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.

For the Legislature to devise effective means for dealing with social and economic problems which affect people and groups differently, it must frequently be able to rely on approximations in deciding which groups fall within and which are without the scope of legislation. The Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749, 769, 95 S.Ct. 2457, 2468–69, 45 L.Ed.2d 522 (1975), addressed the problem with the following language:

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369. 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 69–70, 33 S.Ct. 441, 57 L.Ed. 730."

■ Furthermore, a presumption of constitutionality is extended to legislative classifications of the type involved in this case. The standard which governs whether the classifications are rational, is whether facts can reasonably be conceived which would justify the distinctions or differences in state policy as between different persons, *Lindsley v. National Carbonic Gas Co.*, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911). The presumption of constitutionality may justify discriminations in the Act even without actual evidence demonstrating a rational basis for the distinctions made. *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

Utah law in essential respects is in accord with federal law. In *Crowder v. Salt Lake County*, Utah, 552 P.2d 646, 647 (1976), this Court stated: "The legislature is presumed to have acted within their constitutional authority even though inequality results." Cf. *Bryson v. Utah State Retirement Office*, Utah, 573 P.2d 1280 (1978); *Utah Farm Bureau Insurance Co. v. Utah Insurance Guaranty Association*, Utah, 564 P.2d 751 (1977); and *State v. Mason*, 94 Utah 501, 78 P.2d 920 (1938).

■ It is, by itself, of no particular significance that the Act in question discriminates in a number of respects; "[d]iscrimination is the essence of classification . . . " *Slater v. Salt Lake City*, 115 Utah 476, 489, 206 P.2d 153, 160 (1949). The real issue is whether the discriminations in this case are invidious. *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). We hold they are not.

The statute authorizes payments to an owner or renter of a "primary residence" rather than to all persons who own property in the State. The classification is supported by reasonable principles. If the nonqualifying property owners or renters are engaged in a business, they will generally be able to pass on to their customers the increased property taxes. The distinction is designed to assist those who are not in a position to pass on such taxes. If the distinction were not made, the result might well be the payment of windfall benefits. In addition, the Legislature could legitimately exclude payments to those who own dwellings in the State which are not used as a primary residence, as that term is defined in the Act, for the reason that the increased property taxes on those properties, such as vacation homes, would not pose as great a threat to a householder's standard of living as taxes or rent paid on a "primary residence."

The $100 minimum and $400 maximum amounts payable to homeowners also fall within the scope of legislative discretion. The $100 minimum weights the formula in favor of those homeowners most in need. The maximum represents a legislative judgment that those who pay more property taxes than would be allowed by the maxi-

mum do not stand in as great a need of assistance. Moreover, the funds available are not unlimited, and the Legislature is entitled to spend the money for that portion of society which the Legislature deems has the greater need for assistance, given the financial resources available. It is not significant that the monetary limits imposed are to some extent arbitrary. In dealing with limited resources, the Legislature had wide latitude in determining how the money could best be spent to attack the problem at which the Legislature aimed. The upper and lower limits on the payments to homeowners are a valid basis for determining how the benefits involved in this case should be distributed. See *Weinberger v. Salfi, supra.* The 2.7% of rent paid for a year's period (with a $100 minimum) is also a valid basis for determining refunds to renters. This formula was designed to provide for comparability of treatment between renters and owners in terms of the impact of increased property taxes on the costs of living.[5]

In subsection (5) the Legislature excluded from benefits any homeowner who is claimed as a personal exemption on another's income tax return or has received more than 50% of his support from a household claiming a refund. A renter or homeowner claimed as a personal exemption on another's individual income tax return, or who received more than 50% of his support from a household claiming a refund under the statute, would be cushioned, at least to some extent, from the effects of inflation in housing costs and would probably not have as great a need for assistance as those persons not receiving such aid. The Legislature would have been justified in concluding that limiting benefits to one householder or renter would serve the purpose of

making payments available to those who need them most without allowing double recovery in whole or in part, directly or indirectly, because a dependent or one who received 50% of his income lived apart from the householder or renter entitled to a payment.

Subsection (6) excludes benefits to those who receive public funds in the form of a rent subsidy or specific allocation of public funds for the payment of taxes or rents. Such persons would not be as directly and severely affected, if at all, by increased costs of housing as those who receive no such governmental subsidies. That classification is not on its face invidiously discriminatory.

Furthermore, both subsections (5) and (6) are sustained by the principle that a discrimination designed to coordinate benefits under two different Acts by precluding a beneficiary from claiming under both is not unconstitutional. *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 256, 30 L.Ed.2d 231 (1970).

Finally, the time limits for residency within the State reflect a legitimate concern for assisting those who have felt the full brunt of the problem. See *Weinberger v. Salfi, supra,* which sustained the validity of a requirement that a widow could only claim benefits based upon her deceased husband's social security if they had been married at least nine months.

In sum, plaintiff has not sustained the burden of demonstrating that the exclusions and other classifications in the Act are arbitrary and capricious or that the classifications are not reasonably related to the purpose of the Act. See *State v. J. B. & R. E. Walker, Inc.,* 100 Utah 523, 116 P.2d 766 (1941).[6] We hold that there is a reasonable

---

**5.** The brief of the defendants contends that the Legislature had such comparative figures before it in enacting this provision. That assertion is not contradicted by the plaintiff in this case. In any event, we are required to presume that that was the purpose of the statutory scheme.

**6.** The dissent suggests that *Walker* is no longer valid law because the statutory classification

scheme was later held unconstitutional. *Justice v. Standard Gilsonite Company,* 12 Utah 2d 357, 366 P.2d 974 (1961). The legal principles stated in *Walker* are, however, well and long accepted. Furthermore, since *Stanton v. Stanton,* 30 Utah 2d 315, 517 P.2d 1010 (1974), has not been relied on in this opinion, the dissent's statement that it was later overruled is simply gratuitous.

basis for the classifications which the Legislature has seen fit to make. See *Hansen v. Public Employees' Retirement System Board of Administration,* 122 Utah 44, 246 P.2d 591 (1952).

## V.

Plaintiff also argues that the Act violates the privileges and immunities clause of Article IV, § 2 of the United States Constitution which provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

■■■ The interstate privileges and immunities clause of Article IV, § 2 was designed to provide a citizen of one state who ventures into another state the same basic rights which the citizens of the latter state enjoy.

■■■ Recently the United States Supreme Court in *Baldwin v. Fish & Game Comm'n,* 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978), revived the doctrine that the privileges and immunities clause only protects "fundamental rights" against state legislation that discriminates against noncitizens.[7] The doctrine of fundamental rights was first established in *Corfield v. Coryell* by Justice Bushrod Washington, 6 Fed.Cas. No. 3230, p. 546 (C.C.E.D.Pa.1825), but has not received an expansive interpretation, and until *Baldwin* has had a somewhat questionable vitality.[8] The basic consideration in resolving the issue of whether a right denied a noncitizen is a fundamental right is whether the state action favoring its own residents frustrates the goal of promoting the development of the Union by reducing the effects of state boundaries with respect to essential rights. As the Court in *Baldwin* stated:

When the Privileges and Immunities Clause has been applied to specific cases, it has been interpreted to prevent a State from imposing unreasonable burdens on citizens of other States in their pursuit of common callings within the State, *Ward v. Maryland,* 12 Wall. 418, 20 L.Ed. 449 (1871); in the ownership and disposition of privately held property within the State, *Blake v. McClung,* 172 U.S. 239, 19 S.Ct. 165, 43 L.Ed. 432 (1898); and in access to the courts of the State, *Canadian Northern R. Co. v. Eggen,* 252 U.S. 553, 40 S.Ct. 402, 64 L.Ed. 713 (1920).

It has not been suggested, however, that state citizenship or residency may never be used by a State to distinguish among persons. Suffrage, for example, always has been understood to be tied to an individual's identification with a particular State. See, *e. g., Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). No one would suggest that the Privileges and Immunities Clause requires a State to open its polls to a person who declines to assert that the State is the only one where he claims a right to vote. The same is true as to qualification for an elective office of the State. *Kanapaux v. Ellisor,* 419 U.S. 891, 95 S.Ct. 169, 42 L.Ed.2d 136 (1974); *Chimento v. Stark,* 353 F.Supp. 1211 (NH), summarily aff'd, 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973). Nor must a State always apply all its laws or all its services equally to anyone, resident or nonresident, who may request it so to do.

---

**7.** See "A Constitutional Analysis of State Bar Residency Requirements Under the Interstate Privileges and Immunities Clause of Article IV," 92 *Harvard L.Rev.* 1461 (1979).

**8.** The purpose of the clause was later elucidated in somewhat different language in *Paul v. Virginia,* 8 Wall. 168, 180, 19 L.Ed. 357 (1869):

to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned. It relieves them from the disabilities of alienage in other States; it inhibits discriminating legislation against them by other States; it gives them the right of free ingress into other States, and egress from them; it insures to them in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness; and it secures to them in other States the equal protection of their laws. It has been justly said that no provision in the Constitution has tended so strongly to constitute the citizens of the United States one people as this.

*Canadian Northern R. Co. v. Eggen, supra* ; cf. *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Some distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of individual States, and are permitted; other distinctions are prohibited because they hinder the formation, the purpose, or the development of a single Union of those States. Only with respect to those "privileges" and "immunities" bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally. (436 U.S. at 383–84, 98 S.Ct. at 1859–60.)

The statutory scheme in providing benefits for those who have resided in the State for the requisite period simply does not deal with something that can be considered a "fundamental right." The Legislature may, of course, dispense with the payment of such benefits at any time, and the benefits are not of the same magnitude of importance as the right to engage in a legitimate vocation for income essential to the maintenance of life, for example.

■ Furthermore, discrimination against nonresidents is not per se barred if it is reasonably related to furthering a legitimate state interest to which the classification is reasonably related, *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Toomer v. Witsell*, 334 U.S. 385, 395, 68 S.Ct. 1156, 1161, 92 L.Ed. 1460 (1948). In *Hicklin v. Orbeck*, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), a nonresident of Alaska challenged an Alaska statute which required preferential hiring of Alaska residents. Holding the statute unconstitutional, the Court, on the authority of *Toomer v. Witsell, supra*, stated that the clause bars "discrimination against citizens of other States where there is no reason for the discrimination beyond the mere fact

that they are citizens of other States" (437 U.S. at 525, 98 S.Ct. at 2488).

The statute at issue requires a beneficiary to be a resident for one year. However, that requirement is based in part on the necessity of establishing a class of persons who, because of their residency in the State, have experienced the full impact of the evils with which the Legislature was attempting to cope. It was not aimed at excluding citizens of other states from the benefits of the Act. The requirement of residency in the State for the specified period is also reasonably related to alleviating the increased costs of living produced in part by increased property taxes. Cf. *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).

■ Plaintiff argues that the renters and owners who are beneficiaries under the Act must be "domiciled in the state." By that plaintiff apparently means that the benefits of the Act are available only to citizens of the State as opposed to all residents.[9] If the Act limited benefits only to domiciliaries of the State, the statute would present a serious constitutional question. Plaintiff, however, is in error in his basic factual contention. The Act does not make entitlement to benefits depend upon whether the owner or renter of a dwelling is a domiciliary of the State. Rather, the crucial distinguishing criteria of the Act is the existence of a "dwelling" in the State which means a "residential structure" which was the "primary residence of an owner or renter for one year." Subsection (3) of the Act provides that the owner or a renter of a dwelling is entitled to· a refund, and the term "dwelling" is defined as a "residential structure . . . constituting the primary *residence* of an owner or a renter who is a *resident* of the state . . ." [emphasis added]. It is true that subsection (2)(c) provides that a *"claimant"* is "any person who has filed a claim for a refund under this section and was domiciled in this

---

**9.** The terms "citizen" and "resident" of a state are generally interchangeable for purposes of analysis under the privileges and immunities clause. *Austin v. New Hampshire*, 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975). See *Toomer v. Witsell*, 334 U.S. 385, 397, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948).

state for the entire calendar year as to which a claim is filed under this section." The Act is hardly a model of precise draftsmanship, as evidenced by the fact that subsection (2)(c) has no operative effect. Despite this reference to the term "domicile," the term usually used to denote state citizenship, the literal language of the Act authorizes payments of benefits to all who have been residents of the State and have had their primary dwelling place in the State.[10]

This construction of the Act is the same construction adopted by the State Tax Commission pursuant to the power conferred upon it by subsection (3)(c) of the Act to promulgate regulations for implementation of the Act. Form TC–40 G.P., entitled "Utah General Homeowner's Tax Refund," adopts residence and not domiciliary status as the threshold qualification.[11]

Finally, since corporations are not citizens of a state under the privileges and immunities clause of Article IV, no claim can legitimately be made that the Act is defective for excluding foreign corporations, *National Mercantile Co. v. Mattson*, 45 Utah 155, 143 P. 223 (1914). In any event, foreign corporations are treated no differently under the Act than domestic corporations.

We conclude there is no impermissible discrimination against nonresidents. Accordingly, we hold that the Act is not invalid under the privileges and immunities clause of Article IV, § 2.

## VI.

Finally, plaintiff contends that the Act creates a State indebtedness in violation of Article XIII, § 9, and Article XIV, §§ 1 and 2 [12] of the Utah Constitution.[13]

10. Paragraphs 3(a) and 3(b) provide:
   (a) The owner of a dwelling is entitled to a refund of state general fund free revenue equal to 27% of the property taxes levied on the dwelling commencing with the calendar year 1979 and each calendar year thereafter, and for which the owner files a claim under this section. The maximum credit allowed under this subsection (a) however, shall not exceed $400 nor be less than $100 per claimant.
   (b) The renter of a dwelling comprising a household is entitled to a refund of state general fund revenue equal to 2.7% of the rent paid on the household during the one year period prior to the month in which the renter files a claim under this section, and each one year period thereafter, or $100, whichever is greater, and for which the renter files a claim under this section; but no claim for this refund shall be granted under this subsection (3)(b) in respect to households residing for more than three months of the calendar year in tax-exempt housing. Claims must be filed between August 1 and December 31 of the year for which the refund applies.
   Paragraph 2(a) provides:
   "Dwelling" means a residential structure, or portion thereof, located in the State of Utah constituting the primary residence of an owner or a renter who is a resident of the state (including the more usual one-family home, part of a multi-unit or multi-purpose structure, mobile home, or houseboat) and so much of the land upon which it is situated or to which it is attached, not exceeding one acre; exclusive, however, of the proportion-

ate part of the structure and land which, as to the owner, produces revenue for the owner, or, as to the renter, produces revenue for the renter. "Dwelling" does not include any personal property, such as furniture, furnishings, appliances, automobiles, or equipment.

11. Form TC–40 G.P. is not part of the record before the Court, but we take judicial notice of it pursuant to Rule 9(2) of the Utah Rules of Evidence.

12. Article XIV, § 2 is obviously not in any way relevant to this case. It provides:
   The State may contract debts to repel invasion, suppress insurrection, or to defend the State in war, but the money arising from the contracting of such debts shall be applied solely to the purpose for which it was obtained.

13. Article XIII, § 9 provides:
   No appropriation shall be made, or any expenditure authorized by the Legislature, whereby the expenditure of the State, during any fiscal year, shall exceed the total tax then provided for by law, and applicable for such appropriation or expenditure, unless the Legislature making such appropriation, shall provide for levying a sufficient tax, not exceeding the rates allowed in section seven of this article, to pay such appropriation or expenditure within such fiscal year. This provision shall not apply to appropriations or expenditures to suppress insurrections, defend the State, or assist in defending the United States in time of war.

The contention that these provisions are violated by the Act is patently without merit. No debt is created; the funds paid are from funds already in the treasury; and there is no necessity for creating a debt to fund the program in the future, if the Legislature decides to continue it. The Legislature is not compelled to continue the refund program. Although the Act on its face constitutes an ongoing program, any legislature is free to repeal it and discontinue the payment of any funds. The Act stands on no different footing than any other ongoing program provided by the State Legislature which contemplates the annual appropriation of funds. The establishment of an agency of government which necessitates the appropriation of monies for salaries for the personnel of the agency necessarily contemplates that the program will be funded each year. A provision for retirement benefits for State employees also contemplates funding by the Legislature on an ongoing basis. But the Legislature is not bound to continue any such programs, and therefore the debt provisions of the Constitution do not apply to prevent the enactment of such programs.

■ In general, the contractual obligations which are subject to the debt limitation provisions are those which obligate the State to impose taxes on an ongoing basis in order to meet the obligation of the debt. See generally *State ex rel. University of Utah v. Candland*, 36 Utah 406, 104 P. 285 (1909).

On October 31, 1979, this Court, because of the urgency of rendering a decision to whether payments could lawfully be made within the short time limitations imposed by the Act, entered an order reversing the judgment and decree of the lower court. This opinion is in support of that order.

CROCKETT, C. J., and HALL, J., concur.

MAUGHAN, Justice (dissenting):

In my opinion, the majority opinion is an astonishing performance.

Indeed, it sparks the recall of Humpty Dumpty's rejoinder to Alice, when she questioned his definition of a term:

'When *I* use a word, 'Humpty Dumpty said, in rather a scornful tone, 'it means just what I choose it to mean—neither more nor less.'

'The question is,' said Alice, 'whether you *can* make words mean so many different things.'

'The question is,' said Humpty Dumpty, 'which is to be master—that's all.'

[Carroll, Lewis, 'Through the Looking Glass']

All statutory references are to Utah Code Annotated, 1953, unless otherwise noted.

The majority opinion challenges the foundation upon which this government of laws is based, viz., the fundamental law (the Constitution of Utah) cannot be ignored or distorted by the Legislature, under the guise the popular will so desires such abrogation; and that such action is merely a matter of policy, and beyond the power of the judicial branch. Furthermore, the majority fails to perceive a unique characteristic of Article XIII, Section 3, that it includes a purpose or objective clause, a fact this Court in *State v. Armstrong*[1] had the perspicacity to discern and utilize as a key to the interpretation of the entire provision. Thus, the dominant theme of *Armstrong* was the constitutionality of an enactment must be determined by its *objective* or pur-

---

Article XIV, § 1 provides:
To meet casual deficits or failures in revenue, and for necessary expenditures for public purposes, including the erection of public buildings, and for the payment of all Territorial indebtedness assumed by the State, the State may contract debts, not exceeding in the aggregate at any one time, an amount equal to one and one-half per centum of the value of the taxable property of the State, as shown by the last assessment for State pur-

poses, previous to the incurring of such indebtedness. But the State shall never contract any indebtedness, except as in the next Section provided, in excess of such amount, and all moneys arising from loans herein authorized, shall be applied solely to the purposes for which they were obtained. (As amended November 8, 1910, effective January 1, 1911.)

1. 17 Utah 166, 53 P. 981, 41 L.R.A. 407 (1898).

pose, in relation to the expressed objective set forth in Article XIII, Section 3; and not the *method* utilized in the statute; for the interdiction applies to acts which undertake to do indirectly that which cannot be accomplished directly.

The obvious intent of the Legislature to secure by indirection that which it was prohibited to do directly is clearly illustrated in the majority opinion, in its attempt to justify the legislative classifications.

The purpose clause of Article XII, Section 3, focuses on the taxpayer to assure compliance with the provision's basic objective that "every person and corporation shall pay a tax in proportion to the value of his, hers, or its tangible property, . . . ." Under this concept each taxpayer is to share proportionately the economic burden. The framers of the Constitution were conscious of the power which could be exerted by special interest groups on the legislative branch to secure a special economic advantage, such as, being relieved of their proportionate share of the economic burden.

In recognition of the multifarious methods which might be utilized to achieve a special advantage, the provision was designed in terms of the ultimate objective so as to encompass any method, which directly or indirectly conferred an economic advantage on one group of taxpayers. Insofar as a tax upon tangible personal property is. involved, the Constitution commands, in mandatory terms, equality among taxpayers (proportionate to the value of their property); unless an express exception is set forth in that instrument. Thus, the general principle recited in the majority opinion, viz., the Legislature is presumed to have acted within their constitutional authority, even though inequality results, is inapplicable and antithetical to the explicit mandate of Article XIII, Sections 2 and 3.

The majority opinion, in addition, to nullifying the purpose clause of Article 13, Section 3, further averts attention from the method aspect as discussed in *Armstrong*, by the diversionary tactic of attributing the challenged statute to the *spending* power rather than the *taxing* power.

. . . The whole field of powers exercisable by the Legislature is divided for convenience into police, revenue, and powers of eminent domain. And what does not fall within the realm of revenue and eminent domain is usually classified as police power. . . .[2]

If one may assume the majority's reference to the great fundamental power to spend was, in fact, intended to identify the police power, yet the basic issue is not resolved. The challenged statute in *Armstrong*, which provided for an abatement or remittance of the taxes of insane, idiotic, infirm, or indigent persons, under the line of reasoning pursued in the majority opinion, could have been similarly identified as an exercise of the police power. However, this Court in *Armstrong*, although recognizing the Legislature had a legitimate interest and power to render assistance to the helpless, ruled the method adopted in its effect and operation violated the mandate of the fundamental law. The facile effort of the majority opinion to frame the issue in such a manner cannot be condoned. The alleged spending power characterization is but a straw man to divert attention from patent *in-validity* of the statute. Significantly, the Legislature also deemed the statute a revenue measure and assigned its administration to the Tax Commission, Section 59-26-1(3)(c), rather than a welfare measure to be administered by the Department of Social Services. The compiler of the Utah Code similarly misapprehended the nature of the legislation and placed it in the Revenue and Taxation Title, 59.

The basic issue is whether the refund provisions of the statute have the effect of relieving a favored class of taxpayers, who pay taxes on tangible property (including in that class, no less, taxpayers who do not pay taxes on tangible property), of their requisite, proportional burden; while at the same time excluding from such relief other taxpayers who pay tax on tangible property.

The majority opinion takes judicial notice of Form TC–40 G.P., "Utah General Home-

**2.** *State v. Mason,* 94 Utah 501, 513–514, 78 P.2d 920, 925, 117 A.L.R. 330 (1938).

owner's Tax Refund." This form is indeed enlightening and further is consonant with the express provisions of the statute. The following are some of the significant provisions:

You qualify for the *general homeowner's tax refund* if you own your home and can answer yes to the following questions:

1. Will you be a legal resident of Utah for the entire year 1979?

2. Did you own and occupy the home as your principal residence on January 1, 1979?

3. Did you furnish your own chief support so that you are not claimed as a dependent on someone else's income tax return?

4. Was your residence subject to *property tax* ?

NOTE: If you answer yes to all of the above questions compute your refund on the following Schedule. (See the instructions on the reverse side for information on completing this form).

### COMPUTATION OF REFUND

You must answer the following questions:

A. Does the property on which your home is located exceed 1 acre?

B. Do your rent out a portion of your home?

C. Do you use a portion of your home for business? (If you answer yes to any of the above questions, you must complete Line 2 below. See instructions on reverse side.)

1. Utah property tax assessed in 1979 on your personal residence reduced by any Circuit Breaker or County Abatements . . . . . . . . . . . . . . . . . . $_____

2. Less: deduction of property tax not qualifying for a refund (must be completed by individuals who checked yes to Questions A, B, or C above. See instructions on reverse side.) . . . _____

3. Balance of your 1979 property tax subject to a refund. (Line 1 less Line 2) . . . . . . . . . . . . . . . . . . . . . . _____

4. Percentage of property tax on line 3 allowed as a refund (27%) . . . . . . X .27

5. Refund allowed (Line 3 multiplied by the percentage on Line 4 but not less than $100.00 or more than $400.00) . . . . . . . . . . . . . . . . . . . . . . $_____

\* \* \* \* \* \*

You must attach a copy of your 1979 property tax notice to this form and mail it by December 31, 1979.

Do not send your original notice. It must be returned to your county treasurer with your property tax payment by November 30, 1979.

I declare under the penalties provided by law that I qualify for the *general homeowner's tax refund* and that this claim has been examined by me and to the best of my knowledge and belief is a true, correct and complete claim. *I further certify that my property taxes have been or will be paid and there are no delinquent property taxes on my residence.* [Emphasis supplied]

The instructions on the obverse side of the form further illustrate the issue in this case; it is provided:

How is the *refund* figured?

You must first answer the four questions on the reverse side. You qualify for the refund if you can answer yes to each question. You should next determine *your 1979 property tax subject to a refund.*

\* \* \* \* \* \*

*After you have determined your property tax subject to refund, you are entitled to a refund of 27% of your property tax,* but not less than $100.00 nor more than $400.00. [Emphasis supplied]

The correlation between the payment of property taxes and eligibility for a refund is further substantiated in the instructions for Form TC–40–R.P. It provides, in part:

*Housing not subject to property tax does not qualify for the refund.* Students in university housing do not qualify. If you reside in exempt housing less than 3 months, you can qualify for the refund, but only the rent paid while in *housing subject to property tax will qualify.* [Emphasis supplied]

It would appear, there are only three people in the State of Utah, who do not know the measure under consideration is a tax relief measure.

The majority's analysis of the *Armstrong* case is incomplete and concentrates its attention on this Court's description and comments on the particular method involved in the legislative enactment challenged therein. The majority then focuses on the tax collector and concludes the constitutional proscription is not violated if the property taxes collected by the taxing entity are not reduced. The majority refuses to acknowledge the basic economic consequences that the legislature, by manipulation of its overall revenue power, has devised a scheme to relieve some property taxpayers of their proportionate economic burden in violation of Article XIII, Sections 2 and 3. If the legislature desires to grant property tax relief, it has the power to reduce the levies the local authorities may assess and collect. If the legislature determines the health, safety and welfare of the citizenry are jeopardized by the deleterious effects of inflation, it can, under the police power, grant welfare payments to every household in the state. The legislature even has the option of reducing or repealing taxes. The legislature may not classify taxpayers (of tangible property), and devise a method to relieve one group of its proportionate burden, at the expense of others.

### I. The Tax Article

The issue then realistically formulated is whether 59–26–1, as enacted 1979 is unconstitutional. It is, in several particulars.

First, the provisions violate Article XIII, Sections 2 and 3, Constitution of Utah.

Section 2 provides:

All tangible property in the state, not exempt under the laws of the United States, or under this Constitution, shall be taxed in proportion to its value, to be ascertained as provided by law . . .

Section 3, provides:

The Legislature shall provide by law a uniform and equal rate of assessment and taxation on all tangible property in the state according to its value in money, and shall prescribe by law such regulations as shall secure a just valuation for taxation of such property, *so that every person and corporation shall pay a tax in proportion to the value of his, her, or its tangible property,* . . . [Emphasis supplied]

By these provisions, the framers of the Constitution intended that no property taxpayer should be relieved from the burden of taxation, except as set forth in the specified exemptions. In particular, Section 3 makes it incumbent upon the legislature to provide a uniform system by which all tangible property within the State, not exempt by the organic law, would equally and ratably bear its due proportion of the public burden. The legislature has no power to exempt property not exempt under the Constitution. The intention manifest from the several provisions of the Constitution, respecting revenue and taxation, is "that no power should exist in the state government to grant exemptions other than those mentioned in the Constitution." [3]

In *State v. Armstrong* [4] the issue was whether a statute providing for the partial abatement or remittance of the taxes of insane, idiotic, infirm, or indigent persons was prohibited by the constitution, as being in effect an exemption of property from taxation, which was not included within the list of exemptions contained in the fundamental law.

This Court acknowledged the terms "exemption" and "abatement," in their literal sense, have different shades of meaning. This Court continued:

. . . The difference in the sense of these terms therefore relates to the method, rather than the effect; for the ultimate result, whether by exemption or abatement, is precisely the same. In either case the property is relieved from the burden of taxation. Now it is ap-

---

**3.** *Judge v. Spencer*, 15 Utah 242, 245–246, 48 P. 1097 (1897).

**4.** Note 1 supra.

prehended that the intention of the framers of the constitution, by exempting certain property, was not so much to prevent an assessment and levy of tax thereon as to free it from the burden of maintaining the government. When the tax is abated or remitted after it has been levied, the same object is accomplished; and therefore the mandates of the constitution, that such burdens 'shall be equal and uniform' on all property within the state, except such as is exempt by the fundamental law, and that 'every person and corporation shall pay a tax in proportion to the value of his, her, or its property' may be violated by either method.[5]

This Court further explained:

. . . The meaning and intent manifest from the constitution are that no property shall be relieved from the burden of maintaining the government, except such as was defined and specified for exemption by that instrument. No one would contend for a moment that the legislature of this state has power in express terms to exempt property from taxation, other than that enumerated for exemption in the constitution; and yet in the enactment of the statute in question the legislature has undertaken to indirectly exempt property not so enumerated. This is an attempt to do indirectly that which could not be done directly, and the statute therefore is in violation of the constitution, and is void, as in excess of legislative authority. To prevent the legislature from exempting property not included within the exemptions of the constitution, express words of inhibition were not necessary. The positive direction that 'all property not exempt under the laws of the United States or under this constitution shall be taxed,' and that the rate of assessment and taxation shall be 'uniform and equal' so that 'every person and corporation shall pay a tax in proportion to the value of his, her, or its property,' with the enumeration of

the property exempted, contains an implication against an exemption of any other property by the legislature. That direction itself operates as a restraint upon the legislative power. [Citations][6]

Certain principles emerge from the line of cases cited: Under sections 2 and 3 of Article XIII, all tangible property should equally and ratably bear its due proportion of the public burden unless it is specifically exempted by the Constitution. The legislature has no power or authority to relieve property from the burden of maintaining the government beyond that expressly granted in the Constitution. In assessing a legislative enactment, it is the effect or ultimate result which determines its constitutionality and not the method, for the legislature may not do indirectly that which it is prohibited from doing directly. Thus, if the enactment has the effect of relieving the property taxpayer from its proportionate share of the burden of taxation, it constitutes a proscribed exemption.

59–26–1(1)(b) provides, that the purpose of the act is to provide a refund on an equitable basis to those individual households, who have experienced the primary impact of the increases in the property taxes and increased living costs. The equitable basis for the refund is set forth in subsections (3)(a) and (b) and is directly correlated with the property tax on the dwelling of the claimant. Thus, the statute confers direct relief from the consequences of property taxes by relieving the claimant of part of the burden of taxation.

The statute must be assessed in light of its economic realities, it utilizes a method of granting an exemption indirectly to a certain class of owners of property. The owners of the other classes of property are compelled to bear a disproportionate share of the tax burden. If the legislature had attempted to grant a partial exemption to the favored owners, it would clearly fall within the constitutional proscription, even

---

5. at p. 172 of 17 Utah, at p. 982, of 53 P.

6. at pp. 172–173 of 17 Utah, at p. 983 of 53 P.; also see *State v. Salt Lake County*, 96 Utah

464, 85 P.2d 851 (1938); *Moon Lake Electric Association, Inc. v. Utah State Tax Commission*, 9 Utah 2d 384, 345 P.2d 612 (1959).

though the legislature had appropriated the funds to local government to compensate for the decreased revenue. The present statutory scheme is merely an alternative design to relieve indirectly some of the property taxpayers of their proportionate share of the tax burden. The ultimate result of the statute is to create two classes of property taxpayers, and relieve only one class of its ratable share of the tax burden; such an enactment is unconstitutional.

## II. The Non-resident

The statute further excludes a taxpayer, who is not a resident of the state, who would otherwise qualify under the terms of the act. See, subsection (2)(a). This provision violates the constitutional interdiction of Article III, Second, Constitution of Utah:

. . . The lands belonging to citizens of the United States, residing without this State shall never be taxed at a higher rate than the lands belonging to residents of this State; . . .

## III. Equal Protection

The equal protection analysis of the majority opinion is not consonant with Utah case law. The federal standard for judging the constitutionality of a legislative classification, in the area of economics and social welfare, is inadequate for the more stringent standards expressed in Article I, Section 24, Constitution of Utah. Furthermore, even under the relaxed federal standard, the majority's sole justification for the arbitrary classifications is predicated on ipse dixit statements.

I cannot agree with the premise of the majority opinion that for the purposes of this opinion exactly the same requirements are imposed for both the Equal Protection Clause of the Fourteenth Amendment and Article I, Section 24, Constitution of Utah, and that Utah law, in essential respects, is in accord with federal law.

7. 564 P.2d 751, 755–756 (1977).

8. 77 Utah 500, 516–517, 297 P. 1013 (1931).

9. 94 Utah 501, 78 P.2d 920, 117 A.L.R. 330 (1938).

The current Utah standards in assessing a legislative classification were set forth in *Utah Farm Bureau Insurance Company v. The Utah Insurance Guaranty Association* : [7]

A classification is never unreasonable or arbitrary in its inclusion or exclusion features so long as there is some basis for the differentiation between classes or subject matters included as compared to those excluded from its operation, provided the differentiation bears a reasonable relation to the purposes to be accomplished by the act. . . .

In order to see whether the excluded classes or transactions are on a different basis than those included, we must look at the purpose of the act. The objects and purposes of a law present the touchstone for determining proper and improper classifications. . . .

It is only where some persons or transactions excluded from the operation of the law are as to the subject matter of the law in no differentiable class from those included in its operation that the law is discriminatory in the sense of being arbitrary and unconstitutional. If a reasonable basis to differentiate those included from those excluded from its operation can be found, it must be held constitutional.

The inception of this Utah standard was in *State v. Packer*,[8] wherein this Court ruled that a classification to be valid, must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, to the end that all persons similarly circumstanced shall be treated alike. The authority cited for this standard was *Royster Guano Co. v. Virginia*, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920). These requirements, along with the refinements developed in *State v. Mason* [9] coincided precisely with Article I, Section 24,[10] and also Article I, Section 2.[11]

10. "All laws of a general nature shall have uniform operation."

11. "All political power is inherent in the people; and all free governments are founded on

The pertinent language of *State v. Mason* is as follows:

A denial of the law's equal protection presupposes an unreasonable discrimination between those included and those excluded from the act whether the act confers a privilege or a right or imposes a duty or an obligation. . . .

. . . to be unconstitutional the discrimination must be unreasonable or arbitrary. A classification is never unreasonable or arbitrary in its inclusion or exclusion features so long as there is some basis for the differentiation between classes or subject matters included as compared to those excluded from its operation, provided *the differentiation bears a reasonable relation to the purposes to be accomplished by the act.*[12] [Emphasis supplied]

\* \* \* \* \* \*

. . . In order to see whether the excluded classes or transactions are on a different basis than those included, *we must look at the purpose of the act. The objects and purposes of a law present the touchstone for determining proper and improper classifications.*[13] [Emphasis supplied]

\* \* \* \* \* \*

It is only where some persons or transactions excluded from the operation of the law are as to the subject matter of the law in no differentiable class from those included in its operation that the law is discriminatory in the sense of being arbitrary and unconstitutional. If a reasonable basis to differentiate those included from those excluded from its operation can be found, it must be held constitutional . . .[14]

This Court has consistently adhered to the *Mason* standards.[15] Although it must be conceded that in application of these standards, there has not always been a uniform result.

The majority opinion refers to *State v. J. B. & R. E. Walker, Inc.*[16] as an example of application of the equal protection standards. Significantly, the classification found valid in the *Walker* case was subsequently found by this Court to be arbitrary and with no reasonable justification, in fact, and unconstitutional in *Justice v. Standard Gilsonite Company.*[17] *Stanton v. Stanton*[18] was overruled by the United States Supreme Court on the ground that the challenged classification, in the context of its purpose, violated the Equal Protection Clause of the Fourteenth Amendment.[19] In the *Walker* and *Stanton* cases, this Court, in application of the *Mason* standards, in fact, deviated therefrom by its emphasis on conceiving a state of facts which would justify the legislative classification. Such an analysis departs from the matrix of the *Mason* test, viz., the classification must bear a reasonable relation to the purposes to be accomplished by the act, for the objects and purposes of a law present the touchstone

---

their authority *for their equal protection and benefit,* and they have the right to alter or reform their government as the public welfare may require." [Emphasis supplied]

12. 94 Utah 507, 78 P.2d 922–23.

13. 94 Utah 508, 78 P.2d 923.

14. 94 Utah 510, 78 P.2d 924.

15. *Carter v. State Tax Comm.,* 98 Utah 96, 96 P.2d 727 (1939); *State v. J. B. & R. E. Walker, Inc.,* 100 Utah 523, 116 P.2d 766 (1941); *Slater v. Salt Lake City,* 115 Utah 476, 206 P.2d 153 (1949); *Hansen v. Public Employees Retirement System Board of Administration,* 122

Utah 44, 246 P.2d 591 (1952); *Justice v. Standard Gilsonite Company,* 12 Utah 2d 357, 366 P.2d 974 (1961); *Stanton v. Stanton,* 30 Utah 2d 315, 517 P.2d 1010 (1974); *Leetham v. McGinn,* Utah, 524 P.2d 323 (1974); *Child v. City of Spanish Fork,* Utah, 538 P.2d 184 (1975); *Bryson v. Utah State Retirement Office,* Utah, 573 P.2d 1280 (1978).

16. See note 15, supra.

17. See note 15, supra.

18. See note 15, supra.

19. 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1974).

for determining the propriety of the classification. In my opinion, the majority here again deviates from *Mason*, and thus strays into error.

The Utah analysis is illustrated in *Carter v. State Tax Commission*,[20] wherein a classification of motor vehicles was based on the fuel used in the engines. The purpose of the legislation was regulatory in nature, an exercise of the police power. This Court ruled the classification did not bear a reasonable relationship to the object of the legislation. This Court stated, if the purpose of the legislation had been to raise revenue, the distinction might have been valid, but such was not the intent of the Legislature. Thus, the Utah standard concentrates on the purpose or objective of the legislation as the focal point in assessing a classification.

In application of the rational basis test to noneconomic matters the United States Supreme Court has adhered to the standards of *Royster Guano Co. v. Virginia*[21] as is illustrated in *Reed v. Reed*:[22]

. . . The Equal Protection Clause of that amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' *Royster Guano Co. v. Virginia* . . .[23]

A subtle but important distinction has developed in application of the rational basis test by the United States Supreme Court in the area of economics and social welfare. In *Dandridge v. Williams*[24] the court stated:

. . . In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' [Citation] 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' [Citation] 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' [Citation]

\* \* \* \* \* \*

. . . But the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all. [Citation] It is enough that the State's action be rationally based and free from invidious discrimination . . .[25]

20. 98 Utah 96, 109, 96 P.2d 727 (1939).

21. 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920).

22. 404 U.S. 71, 75–76, 92 S.Ct. 251, 253–54, 30 L.Ed.2d 225 (1971).

23. Also see *Stanton v. Stanton*, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1974), wherein the Court held § 15–2–1, U.C.A.1953, imposed criteria wholly unrelated to the objective of that statute.

24. 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

25. 397 U.S. 486–487, 90 S.Ct. 1161–62. Also see *Jefferson v. Hackney*, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *Mathews v. DeCastro*, 429 U.S. 181, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976); *Mathews v. Lucas*, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976); *City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Idaho Department of Employment v. Smith*, 434 U.S. 100, 98 S.Ct. 327, 54 L.Ed.2d 324 (1977).

Mr. Justice Marshall in a dissenting opinion in *Massachusetts Board of Retirement v. Murgia*[26] pointed out the dichotomy in the articulated application of the rational basis test in economic and welfare matters. He asserted that when the mere rationality test is applied as articulated, there is little doubt in the outcome; the challenged legislation is always upheld. He states:

> . . . It cannot be gainsaid that there remain rights, not now classified as 'fundamental,' that remain vital to the flourishing of a free society, and classes, not now classified as 'suspect,' that are unfairly burdened by invidious discrimination unrelated to the individual worth of their members. Whatever we call these rights and classes, we simply cannot forgo all judicial protection against discriminatory legislation bearing upon them, but for the rare instances when the legislative choice can be termed 'wholly irrelevant' to the legislative goal. [Citation]
>
> While the Court's traditional articulation of the rational-basis test does suggest just such an abdication, happily the Court's deeds have not matched its words. Time and again, met with cases touching upon the prized rights and burdened classes of our society, the Court has acted only after a reasonably probing look at the legislative goals and means, and at the significance of the personal rights and interests invaded . . .[27]

Mr. Justice Marshall cited a line of cases, including *Stanton v. Stanton*[28] and *Reed v. Reed*.[29] He stated:

> . . . These cases make clear that the Court has rejected, albeit *sub silentio*, its most deferential statements of the rationality standard in assessing the va-

lidity under the Equal Protection Clause of much noneconomic legislation.[30]

Mr. Justice Marshall advocates a standard similar to that applied in *Reed v. Reed*,[31] viz., to sustain the classification, the state must show a reasonably substantial interest and a scheme reasonably closely tailored to achieving that interest.[32] The *Reed* standard was derived from *Royster Guano*, the source of the Utah standard and the one consistent with express provisions of Article I, Section 24, Constitution of Utah. This Court should continue its traditional adherence to these requirements in applying this state constitutional provision.

The majority opinion cites and relies on *Weinberger v. Salfi*[33] as an interpretive standard for both the Fourteenth Amendment and the Utah Constitution. In that case, the Court, through Mr. Justice Rehnquist, stated that the standard for testing the validity of a legislative classification concerning the withholding of a noncontractual benefit, under a social welfare program, is whether the statute manifests a patently arbitrary classification, utterly lacking in rational justification.[34] The legislative action is not deemed arbitrary, if the goals sought are legitimate, and the classification adopted is rationally related to the achievement of those goals. This less stringent standard neither comports with the requirements established over a period of forty eight years in Utah case law nor does it coincide with Article I, Section 24. It does not because it fails to focus clearly on the expressed legislative purposes and the relationship thereto of the selected criteria constituting the basis for the classification.

Even under the standards of the United States Supreme Court, the challenged statute falls within the ambit of *United States*

---

26. 427 U.S. 307, 318–327, 96 S.Ct. 2562, 2569–2574, 49 L.Ed.2d 520 (1976).

27. 427 U.S. 320, 96 S.Ct. 2570.

28. See note 19, supra.

29. Note 22, supra.

30. 427 U.S. 321, 96 S.Ct. 2570.

31. Note 22, supra.

32. 427 U.S. 325, 96 S.Ct. 2572.

33. 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).

34. 422 U.S. 768, 95 S.Ct. 2468.

*Department of Agriculture v. Moreno*,[35] wherein a statutory classification of households was held not only imprecise but wholly without any rational basis. In the *Moreno* case, the classification of households under the food stamp program was challenged under the equal protection component of the Due Process Clause of the Fifth Amendment. Eligibility for the program was limited to households, where all members thereof were related. The declared purpose of the food stamp program was to alleviate hunger and malnutrition among the more needy persons in the society.

The Court applied the traditional equal protection analysis. A legislative classification must be sustained if the classification itself is rationally related to a legitimate governmental interest.[36] The Court observed that the challenged statutory classification of households was clearly irrelevant to the stated purposes of the act. The relationships, among persons constituting one economic unit and sharing cooking facilities, had nothing to do with their personal requirements. The Court further explored whether the challenged classification might be sustained on the ground it rationally furthered some legitimate governmental interest other than those specifically stated in the congressional declaration of policy. The legislative history indicated a purpose to prevent "hippie communes" from participating in the food stamp program. A purpose to harm a politically unpopular group did not constitute a legitimate government interest and thus did not justify the classification.

As in *Moreno*, the classification of households in the instant case, is not only imprecise, it is wholly without any rational basis. Under the classification, those who are excluded from receiving a refund, as well as the amount of the refund of those who are eligible, is not rationally related to the purpose of the act, viz., to refund revenues on an equitable basis to those households which have been subject to extreme economic hardship experienced as a result of increases in property taxes and living costs.

The attempted justification of this classification by the majority opinion should be scrutinized. The arbitrariness of the formula is deemed immaterial and justified by the statement the Legislature was entitled to spend the money for that portion of society which it deemed had the greater need for assistance, given the financial resources available. The formula, in fact, accomplishes the opposite result—those who have the financial resources to pay higher property taxes or rents are refunded larger sums, unless the majority intends to imply that this group was deemed by the Legislature to be in greater need of assistance.

Nevertheless, from whatever aspect the matter is approached, the classification under the statutory formula for refunds does not bear a reasonable relation to the expressed purposes to be accomplished by the act, viz., the formula establishes a criteria wholly unrelated to the objective of the statute.

The justification of the majority for the exclusion contained in subjection (5) must be characterized strictly as an ipse dixit statement, viz., those excluded "would be cushioned, at least to some extent, from the effects of inflation in housing costs and would probably not have as great a need for assistance as those not receiving such aid." In fact, these ineligible people do live in separate households and must pay rent or property taxes. It defies logic to assert that those, who are dependent on another individual for support, are cushioned from the effects of inflation and economic hardship. Obvious members of this ineligible class are students, who due to the tax laws may be taken as dependents on their parents' income tax, and the elderly, whose separate households must be partially maintained by private assistance.

A similar infirmity infects the justification of the majority opinion as to the exclusion in subsection (6). The majority states such persons would not be as directly and

---

**35.** 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

**36.** 413 U.S. 533, 93 S.Ct. 2825.

severely affected, if at all, by increased costs of housing as those who receive no such governmental subsidies. This statement ignores the purpose provision of the act and further fails to acknowledge the nature of the economic circumstances of those who must seek government assistance to survive.

The statute through its exceptions in subsections (5) and (6) constitutes a denial of equal protection in violation of Article I, Sections 2 and 24, Constitution of Utah and the Fourteenth Amendment of the Constitution of the United States. If the argument were tenable that the statute did not create an impermissible exemption and the reference to property taxes was merely a convenient yardstick to apportion the excess general funds, then the classification established must be deemed purely arbitrary.

A legislative classification is never arbitrary or unreasonable so long as the basis for differentiation bears a reasonable relation to the purposes or objectives to be accomplished by the act. If some persons or transactions, excluded from the operation of the law, were as to the subject matter of the law in no differentiable class from those included within its operation, the law is discriminatory in the sense of being arbitrary and unconstitutional . . .[37]

The expressed legislative intent was to distribute excess funds on an equitable basis to individual households, which had been subjected to extreme economic hardship by the recent increases in taxation and the cost of living in the state, subsection (1)(b). The statute then creates a classification, unrelated to the magnitude of the economic impact on the claimant caused by increased cost of living, and specifically excludes some of those with the least economic resources, viz., those who receive some form of public assistance from the state, and some of those who receive support from another individual. Since the refund is geared to the amount of property tax or rent paid by the claimant, those with the greatest economic resources receive the largest refund. It should not be overlooked that the statute establishes no limitation on the amount a renter may receive as refund. Some of those at the bottom of the economic scale, whose existence is dependent on public or private assistance, are entirely excluded.

The purpose of the statute is to relieve "extreme economic hardship" by distributing the funds on an equitable basis. The classification is arbitrary and unreasonable, for the basis of differentiation, between those who are and those who are not eligible to receive the refund as well as the amount to which they are entitled, does not bear a reasonable relation to the avowed purpose to be accomplished by the statute. In fact, those who are excluded from receiving a refund were in no differentiable class from those who are entitled to a refund and are perhaps in greater economic need as a consequence of the recent increases in the cost of living. Furthermore, the basis of allocation of the funds constitutes a criteria wholly unrelated to the objective of the statute, viz., an equitable distribution to households who have experienced "extreme economic hardship." The plan of distribution is arbitrary for the refund is not correlated with the degree of economic hardship experienced by the individual household but rather is weighted to refund greater sums to those with greater economic resources.

## IV. Public Debt

Subsections (3)(a) and (b) of the statute provide for a refund commencing with the calendar year of 1979 and "each calendar year thereafter." The authorization of such an expenditure by the Legislature violates Article XIII, Section 9, and Article XIV, Sections 1 and 2 of the Constitution of Utah, for it requires future appropriations to meet this binding statutory obligation.[38] The effect of the statute is to create a state indebtedness in contravention of Article XIV, Section 1, for it places a duty upon the

---

**37.** *Leetham v. McGinn*, Utah, 524 P.2d 323, 325 (1974).

**38.** *Utah Housing Finance Agency v. Smart*, Utah, 561 P.2d 1052, 1056 (1977).

state to pay out state funds to be obtained from future tax levies. In *State ex rel. University of Utah v. Candland*,[39] this Court stated:

. . . in order to constitute an indebtedness within the provisions of the constitutional limitation it is not necessary that the debt be evidenced by bonds, notes, or other usual evidences of indebtedness, but it is sufficient if in order to discharge the debt the state is obligated to pay it at some future time, and that it casts a future burden upon the taxpayer to the extent of a debt or obligation which must be paid by the state of Utah with funds derived from general taxation. . . .

By its express provisions the statute recites there is an excess of free funds within the general fund. The term "excess" connotes something that exceeds what is usual; yet the statute authorizes future expenditures when the status of the general fund will be unknown. There is a certain irony that a statute designed to grant relief from economic hardship creates a binding obligation for the state, which might in the future compel a tax increase.

### V. Conclusion

The motives of the legislature for enacting 59–26–1 are commendable and reflect a sensitivity to the needs of the citizens of this state ensnared in an inflationary spiral. However, such motives are not sufficient to sustain an abrogation of Article XIII, Constitution of Utah.

The words of Justice Bartch in *State v. Armstrong*[40] are most appropriate:

. . . the question whether an enactment of the legislature is void because of its repugnancy to the constitution is always one of much delicacy, and in a doubtful case should seldom, if ever, be decided in the affirmative. Where, however, the mind is convinced of the unconstitutionality of the law, the duty which devolves upon the court to declare it so is imperative, even where as in this case,

the statute appears to be in consonance with justice and humanity. That the law itself would be beneficent can be of no avail in this case, because its effect and operation would be to exempt property, against the mandate of the fundamental law. . . .[41]

Other issues were raised. I do not reach them, because I have dealt with the primary ones, and they are dispositive.

· WILKINS, Justice (concurring generally with dissent):

I concur generally with the dissent of Mr. Justice Maughan, and add these comments.

What must be understood here, in my opinion, is that this statute, benign though the motives may have been the enacting it, is not some harmless detour of a minor legal principle. It is rather a major assault upon Article XIII of the Constitution of this State and the caselaw following and guarding it, both of which forbid inequality of taxation (except where specifically authorized in our basic document)—and indeed forbid that inequality regardless of the form of the mechanism employed to accomplish it. And it is no convincing argument, I submit, to say that Article XIII is, not violated here because none of the funds to be refunded by Section 59–26–1 originate from or are identified with *property tax* funds. Why? The Legislature in Article ·XIII is the very body specifically charged with the solemn duty to ". . . provide by law a uniform and equal rate of assessment and taxation on all tangible property . . ." (at § 3 of Art. XIII)—and that duty is imposed without, of course, implanting the seeds of its own destruction by legally permitting the Legislature to accomplish indirectly a result when Article XIII expressly and directly forbids that result.

In short, though it may be gratifying and socially worthy to see public funds generously distributed by the State of Utah to tens of thousands of property owners (and

---

**39.** 36 Utah 406, 424, 104 P. 285, 292 (1909).

**40.** Note 1, supra.

**41.** at p. ·174 of 17 Utah, at p. 983 of 53 P.

renters) in this State, that worthiness cannot, in my view, magically imbue the legislation here with constitutional validity.